**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DENNIS ALLEMANI and      :
NATHANIEL BARLOW, JR.,      :
     :
     Plaintiffs,      :
     :      CIVIL ACTION NO.
v.      :      1:12-CV-00100-RWS
     :
PRATT (CORRUGATED      :
LOGISTICS) LLC,      :
     :
     Defendant.

**<u>ORDER</u>**

This case is before the Court on Plaintiffs' Motion for Partial Summary Judgment [66] and Defendant's Motion for Summary Judgment [67]. After reviewing the Parties' submissions and the record, the Court enters the following Order.

**Background[1]**

Pratt (Corrugated Logistics), LLC ("Pratt") is an independent trucking company formed by Pratt Industries to provide logistical and transportation services to Pratt Industries' corrugated box plant and paper mill located in

---

[1] Unless otherwise noted, the facts are taken from the Parties' respective statements of material facts and are undisputed.

Conyers, Georgia.  Pratt's services include shipping raw and/or finished product by truck to internal customers (i.e., other Pratt Industries facilities) and external customers.  Pratt also transports "backhauls" (loads picked up and delivered on the way back from an initial delivery).

Pratt's Conyers facility is staffed by drivers, dispatchers, and a logistics manager who reports to the company's national logistics manager in Indiana.  During the relevant time period,[2] Plaintiffs were dispatchers at Pratt's Conyers location.  Barlow was a Pratt dispatcher from July 2002 to May 2012.  Plaintiff Allemani was employed as a dispatcher from 2006 until November 2011.  Greg Holley was the logistics manager from October 2008 until October 2011, when Tony Broyles was hired for the position.

Holley and Broyles were direct supervisors of dispatchers, including Plaintiffs, and official supervisors of Pratt's truck drivers.  In addition to supervising the logistics staff, Holley and Broyles had several other duties.  For example, Broyles was responsible for all safety, customer service and

_____

[2] The Parties agree that the relevant time period for this suit is three years prior to the filing of Plaintiffs' Complaint.

operational processes for Pratt facilities in the southeast region, and for direct oversight of Pratt's Statesville, North Carolina location.

Plaintiffs' precise duties are heavily disputed between the Parties. The Parties agree that Plaintiffs were responsible for assigning loads to drivers and their "ultimate priority was getting loads delivered to customers in a timely and safe manner." The Parties also agree that Plaintiffs' duties were performed in an office setting and did not require performance of manual labor. Only one dispatcher at a time was on duty, and dispatchers worked from a different office than the logistics managers. There is no dispute that dispatchers did *not* work in the following business areas: finance, accounting, auditing, purchasing, advertising, marketing, administration of benefits, government relations, or computer network administration.

At a safety meeting on December 3, 2011, Broyles gave a Powerpoint presentation to logistics employees. A slide in the presentation said: "All Conyers drivers report to Tony Broyles. Your Dispatcher (Bruce, Kenny, Nate, Nicole, Wade) is not your supervisor. Dispatchers do not have authority to approve or reject vacation requests, FMLA, schedule changes, operational changes, etc." (Safety Powerpoint, [65] at 8 of 29.) Prior to the meeting, the

3

Powerpoint was approved by Pratt's divisional president and the national logistics manager.

Allemani declares that he spent "almost all" of his time assigning loads and backhauls to drivers. (Second Allemani Dec., [74-3] ¶ 2.) Similarly, Barlow declares that he spent "at least 75%" of his time assigning loads and backhauls. In Barlow's deposition testimony, he describes a three-step process for assigning loads. (Pl.s' Barlow Depo., [66-8] at 72-73 of 108.) First, dispatchers assign "hot loads" (priority loads), which are identified daily by the logistics manager and "shipping." (Id.) Non-priority "appointment loads" or "dock time loads" (loads that have to be delivered and unloaded at a specific time) are assigned next. (Id.) Then, according to Barlow, the dispatchers "start going down the list for the drivers and the miles." (Id.) Barlow stated that he would "try to make [drivers with less hours] some money" by assigning them trips. (Id.) Allemani testified that it was Pratt's policy to try to equalize miles between available drivers. (Allemani Depo., [67-9] at 36-36 of 107.)

The shipping department, not dispatchers, determines which loads go to which customers. (Broyles 30(b)(6) Depo., [66-9] at 49 of 142.) Dispatchers also receive a list of pre-approved backhauls (compiled by Visy Recycling,

4

another subsidiary of Pratt Industries), which they assign to drivers who drop off in the vicinity of the backhaul, time permitting.  (Allemani Depo., [67-9] at 53 of 107.)  Dispatchers have authority to call drivers into work early, when needed, and to release them early if there is a lack of work.  (Broyles Dec., [67-14] ¶ 12; Ex. 1.)  However, according to Plaintiffs, while they could request that drivers come early, they did not have authority to force drivers to come in, and they claim it was Pratt's policy for dispatchers to send drivers home when there was no work.  (Second Allemani Dec., [74-3] ¶¶ 21-22; Second Barlow Dec., [74-4] ¶¶ 18.)

Department of Transportation ("DOT") regulations impose certain restrictions on drivers, including: maximum daily driving and work limits, requirements concerning valid licenses and medical certifications, and random drug testing.  Dispatchers are not permitted to assign loads to drivers who do not meet all DOT requirements, and in fact, Pratt's electronic dispatch system will not allow dispatchers to assign loads to disqualified drivers because of, *inter alia*, an overdue drug test or an expired driver's license or medical card. Dispatchers send drivers to complete their drug testing requirements, but dispatchers are not responsible for tracking drivers' compliance with DOT

5

requirements.  Pratt's safety director keeps track of drivers' compliance

information and enters the information into the company's computer system.

Other factors, aside from DOT requirements, considered by dispatchers

in assigning loads include: status of equipment, availability of loads, whether

the driver is sick or stuck at a customer location, and speed with which different

drivers complete their job.  (Olshefski Depo., [67-4] at 32-33 of 41; Broyles

Depo., [67-6] at 35 of 82.)  Drivers are required to accept load assignments

given to them by dispatchers.  If drivers refuse to take loads assigned to them,

dispatchers have authority to send them home.

During his deposition, Broyles stated that it was his responsibility *and* the

dispatchers' responsibility to handle drivers' complaints and grievances.

(Broyles Depo., [67-6] at 13 of 82.)  According to Broyles, "[a]ny time there's a

customer service issue related to a driver, if there is a safety issue related to the

driver, if there's any kind of a work procedure or operational issue with that

driver, the dispatcher is the first person to receive that complaint or grievance

and address it to the best of their ability."  (Id.)  Kenny Smith (a dispatcher)

stated that if drivers had disputes amongst themselves, they would typically

bring it up with a dispatcher first and if the dispatcher could not resolve the

problem, the issue would be referred to the logistics manager.  (Smith Depo.,

[66-11] at 23-25 of 91.)  However, if drivers have complaints about how the

company is treating them, those issues are referred to management directly.  (Id.

at 25 of 91.)  According to Plaintiffs, drivers often "griped" to them or "blew

off steam," but Plaintiffs did not have authority to address or resolve serious

complaints about compensation or other company policies.  (Second Allemani

Dec., [74-3]; Second Barlow Dec., [74-4] ¶ 21.)

      Because Holley and Broyles had limited direct contact with drivers,

Plaintiffs conveyed information about driver performance to them.  On two

occasions during Barlow's ten-year employment with Pratt, once in 2007 and

once in 2011, he was asked to complete formal driver performance reviews for

certain drivers.  In December 2011, Barlow evaluated at least sixteen drivers; in

2007, he evaluated at least six drivers.  Allemani completed formal evaluations

of at least seven drivers in 2007, but was no longer employed at Pratt when the

2011 evaluations occurred.  On these occasions, Plaintiffs evaluated drivers on

numerous "performance factors" and offered individualized comments

regarding the drivers' strengths and weaknesses.  (See, e.g., [67-9] at 101-04 of

107.)  According to Holley, Pratt did not conduct formal performance reviews

7

of truck drivers in 2008, 2009, or 2010.  (Holley Dec., [67-15] ¶ 7.)  A driver's

performance review is a factor in deciding whether to increase his pay.

However, Pratt has not identified any instance in which it followed a

recommendation of either Barlow or Allemani to determine whether another

employee received a promotion, suspension or termination.

  According to Broyles, Plaintiffs "had the authority to informally

discipline truck drivers as well as impose the formal discipline of a verbal or

written warning."  (Broyles Dec., [67-14] ¶ 15.)  Further, he states, he "relied on

the dispatchers to recommend to [him] any additional forms of discipline (such

as a formal written warning or suspension) that might be necessary in a given

case."  (Id.)  Holley stated that, given his limited interaction with drivers, he

"depended on the dispatchers to bring to [his] attention issues with the drivers

(including performance problems) that [he] would likely not otherwise be aware

of. [He] also expected the dispatchers to recommend disciplinary action to

[him] when appropriate."  (Holley Dec., [67-15] ¶ 6.)

  Plaintiffs agree they had the authority to, and did, "write up" drivers and

report policy violations and disciplinary problems to Holley and Broyles.  They

also admit that on a few occasions, they recommended disciplinary action be

8

taken by upper management, even though, in Barlow's case, his supervisors never asked him for such a recommendation.  But Plaintiffs maintain that they had no authority to take disciplinary action against other Pratt employees.  During his deposition, Broyles clarified: dispatchers "can provide verbal and written warnings.  Anything beyond that requires management."  (Broyles Depo., [67-6] at 19 of 82.)  According to Broyles, dispatchers may not issue suspensions, issue final written warnings, or terminate drivers.  (Id. at 19-20 of 82.)  Those disciplinary actions require "HR management and [logistics manager] review."  (Id. at 19 of 82.)  However, verbal and written warnings issued by dispatchers factor into determining whether a driver will receive a pay increase.  (Broyles Dec., [67-14] ¶ 14.)

Broyles stated during his deposition that he and dispatchers have responsibility for training drivers.  (Broyles Depo., [67-6] at 5 of 82.)  According to Broyles, dispatchers train drivers on "various work procedures," including training on Pratt's electronic system for driver log keeping and training on procedures for deliveries, customer service and safety.  (Id.)  Broyles stated that, "from time to time" he trained drivers in these areas.  (Id.)

9

Plaintiffs dispute they had any responsibility for training drivers, except when Barlow was pulled off dispatcher duty for two weeks in 2007 to train drivers on a new computer system.  (Barlow Depo., vol. III, [66-7] at 84 of 120.)  Aside from that, they argue, dispatchers had no formal training duties; they simply helped drivers figure out company procedures on an informal basis.  (Id. at 84-85 of 120; Pl.s' Barlow Depo., [66-8] at 55-57 of 108.)  Allemani stated that by the time a driver came to him for assignments, he expected the driver to be fully trained, and he was aware of quarterly safety trainings conducted by Holley and Broyles.  (Second Allemani Dec., [74-3] ¶ 31.)  Pratt occasionally gave dispatchers copies of new company policies, which dispatchers circulated to drivers.

Dispatchers do occasionally interact with internal and external Pratt customers.  However, all customer complaints are handled by the customer service department or the logistics manager.  (Smith Depo., [66-11] at 61-62 of 91.)  Furthermore, when customers need to be notified of a late delivery (e.g., because of a flat tire or other unexpected delay), the dispatchers relay the information to customer service and that department contacts the customer.  (Allemani Depo., [66-5] at 119 of 304.)  According to Allemani, even when

10

incidents occurred outside of normal business hours and a customer needed to be notified, he still contacted customer service or the logistics manager via email or personal phone so they could contact the customer.  (Id. at 119-21 of 304.)  Barlow stated that, although it was not typical, he did sometimes call customers to say that a load was delayed.  (Barlow Depo., vol. IV, [74-5] at 8 of 29.)

Dispatchers do receive calls from Pratt customers, but as soon as the caller is identified as a customer, he or she is transferred to customer service or a manager.  (Allemani Depo., [66-5] at 177 of 304.)  One customer, Confederate Packaging, got in the habit of calling Allemani every morning to inquire about its daily deliveries.  (Id.)  However, as a general rule, dispatchers did not receive or handle customer inquiries about the status of loads.  (Barlow Depo., vol. IV, [74-5] at 7 of 29.)

Drivers are required to perform pre-trip and post-trip inspections of their trucks.  Pre-trip, drivers check to ensure that all air lines are in proper order, all electrical outlets and lights are working, and all tires are okay.  Drivers turn their pre- and post-trip inspection reports in to the dispatch office every day. When necessary, dispatchers follow up with drivers to make sure the reports are

11

completed.  Barlow stated that he had to report drivers to the logistics manager when they failed to complete their inspections.  (Barlow Depo., vol. II., [67-11] at 7 of 122.)

According to deposition testimony of Thomas Olshefski, former Northeast Regional Logistics Manager for Pratt, if an inspection report reveals that there is a maintenance need, the issue is "basically communicated from the dispatchers to the lease provider, and the dispatcher is also the one[] that get[s] the trucks over there for repairs."  (Olshefski Depo., [67-4] at 25 of 41.) However, Plaintiffs deny that dispatchers coordinate repair work.  Allemani and Barlow stated that when they were drivers for Pratt, they determined whether their trucks needed repairs and after they informed dispatch of any problems, they contacted Pratt's lease provider for maintenance work or a replacement truck, and they took the trucks to the shop.  (Allemani Depo., [66-5] at 83 of 304; Barlow Depo., vol. I, [74-6] at 81-82 of 111.)  Allemani described a similar process when he became a dispatcher: drivers would inform him that a problem arose during inspection or on a delivery, and then the driver would contact the appropriate party for maintenance.  (Allemani Depo., [66-5] at 127-28 of 304.)  For a time, dispatchers did provide purchase order numbers (from a

12

list on their computers) to drivers who called from the road with certain repair problems.

By keeping track of Pratt's trucks, trailers and drivers, and by ensuring that loads are delivered on time, dispatchers do have an impact on Pratt's bottom line.  They also generate revenue for Pratt by assigning backhauls to drivers.  During Pratt's budget process, dispatchers provide information to upper management to assist their understanding of dispatch operations, including costs.  (Id. at 22 of 82.)  But dispatchers do not have any responsibility for planning the budget or any control over the budget.  (Broyles Depo., [67-6] at 21-22 of 82.)

Throughout their employment with Pratt, Plaintiffs received a fixed salary every two weeks.  Although Allemani made statements at some office meetings (at which Holley was present) about his long hours and his belief he should be paid more, Plaintiffs never asked to have their pay changed. Dispatchers have historically been classified as FLSA-exempt employees by Pratt.  In 2008, while Pratt was implementing a new payroll system, ADP and Pratt's Human Resources Direct, Bryon Duty, reviewed the FLSA classification

13

of Pratt's dispatchers.  Following that review, Pratt continued to treat dispatchers as salaried, exempt employees.

Bryon Duty, testifying on behalf of Pratt as a 30(b)(6) witness, stated during his deposition that he did not know how the original classification decision was made regarding dispatchers.  (Duty Depo., [67-8] at 4-5 of 15.)  However, Duty (for Pratt) made the decision to continue classifying dispatchers as exempt after the 2008 review.  (Id. at 10 of 15.)  According to Duty, he followed the advice of ADP personnel regarding employees' exempt or non-exempt status.  He also stated that he could not remember what about the dispatcher position led him to classify the position as exempt, nor which exemption(s), in his belief, applied to dispatchers.  (Duty Depo., [66-10] at 23-24 of 56.)

Pratt does not keep track of hours worked by its dispatchers.  It is Pratt's normal course of business to have its dispatchers work more than forty hours per week.  The Parties agree that Plaintiffs did not receive overtime compensation for hours they worked over forty hours per workweek.

## Discussion

## I.    Legal Standard - Summary Judgment

14

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249-50.

15

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II.    Analysis

Plaintiffs' Complaint contains a single claim under the Fair Labor Standards Act's ("FLSA") overtime wage provision, 29 U.S.C. § 207. (Complaint, [1].) Plaintiffs move for partial summary judgment on all issues except the amount of damages [66]. Pratt also moves for summary judgment on

16

Plaintiffs' claim [67].  It is undisputed that Plaintiffs were not paid overtime compensation for hours worked over forty hours per week.  Instead, Pratt maintains that Plaintiffs were properly classified as exempt from the FLSA's overtime pay requirement because they are administrative and/or executive employees.

Under the FLSA, if an employee works over forty hours in a week, he must be compensated time-and-a-half for each hour over forty.  29 U.S.C. § 207(a)(2).  However, the FLSA's overtime pay requirement does not apply to employees "employed in a bona fide executive, administrative, or professional capacity . . . ."  29 U.S.C. § 213(a)(1).  The pertinent terms – "bona fide executive capacity" and "bona fide administrative capacity" – are defined in Department of Labor Regulations.  29 C.F.R. §§ 541.100-541.203.

"The employer bears the burden of proving that an employee is exempt from overtime payments."  Rock v. Ray Anthony Int'l, 380 Fed. App'x 875, 877 (11th Cir. 2010) (citing Atlanta Prof'l Firefighters Union, Local 134 v. City of Atlanta, 920 F.2d 800, 804 (11th Cir. 1991)).  The employer "must prove applicability of an exemption by 'clear and affirmative evidence.'"  Birdwell v. City of Gadsden, 970 F.2d 802, 805 (11th Cir. 1992).  Further, the FLSA

17

"should be interpreted liberally in the employee's favor" and the Act's exemptions "are to be narrowly construed" against the employer.  Id.

A.    Administrative Exemption

Under the applicable regulations, the term "employee employed in a bona fide administrative capacity" means any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  The second and third elements are at issue here.

1.    *Primary duty*

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  Factors to consider when determining an employee's primary duty include: (1) "the relative importance of the exempt duties as compared with other types of

duties;" (2) "the amount of time spent performing exempt work;" (3) "the employee's relative freedom from direct supervision;" and (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id.  The amount of time an employee spends performing exempt work serves as a guide, but is not the sole consideration when evaluating an employee's exempt status.  Id.

To qualify for the administrative exemption, employees "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  Examples of work "directly related to management or general business operations" include work in functional areas such as:

> tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b).  According to Department of Labor guidance, the

"production versus administration" dichotomy underlying the administrative

exemption "is intended to distinguish between work related to the goods and

services which constitute the business' marketplace offerings and work which

contributes to running the business itself."  Wage and Hour Div., U.S. Dept. of

Labor, Administrator Interpretation No. 2010-1 (Mar. 24 2010); *available at*

http://www.dol.gov/whd/opinion/adminIntrprtn/FLSA/2010/FLSAAI2010_1.ht

m (internal quotations and citation omitted).

Plaintiffs argue that their primary duty was assigning loads and backhauls

to drivers, which, they claim, is not an administrative duty but rather work

directly related to the service offered by Pratt: transporting goods from point A

to point B.  Pratt counters that Plaintiffs "controlled dispatching operations,"

which was necessary for Pratt to meet its business objectives.  It is undisputed

that Plaintiffs did *not* perform work in the vast majority of "administrative"

areas listed in the regulations (e.g., tax, finance, auditing, purchasing,

marketing, employee benefits, etc.).  However, Pratt maintains that Plaintiffs

did work in areas of safety, customer relations, legal compliance, personnel

management, and profit/loss decisions, and are thus properly classified as

administrative employees.  The Court agrees with Plaintiffs that their primary duty – dispatching loads – was not administrative.

Dispatchers' involvement with safety issues at Pratt is minimal at best. Drivers were responsible for completing pre- and post-trip inspections of their trucks.  Dispatchers followed up with drivers when they did not turn in their inspection reports, but ultimately, if a driver failed to complete an inspection or turn in a report, Plaintiffs referred him to the logistics manager.  Plaintiffs deny that they completed or coordinated any repair work.  According to Plaintiffs, for scheduling purposes, drivers notify dispatchers when there is a repair problem; the driver then contacts the appropriate repair vendor; and the driver takes the truck for maintenance.

Only Olshefski, the former Northeast Regional Logistics Manager for Pratt, suggests that dispatchers play any meaningful role in coordinating repairs. He stated that dispatchers communicate with the lease provider when a maintenance issue arises and dispatchers send the trucks for repairs.  Even with Olshefki's testimony, it is clear that drivers have responsibility for identifying repair needs and maintaining the safety of their equipment, and dispatchers'

21

involvement, if any, is limited to serving as points of contact for drivers and to sending drivers to take care of any problems.

While dispatchers do technically interact with customers (i.e., when answering the phones), the evidence shows that Pratt's customer service department and the logistics manager handle customer complaints. Allemani stated that when customers needed to be notified of late deliveries, he called customer service or the logistics manager so they could reach out to the customer, even after hours. Barlow stated that he did sometimes call customers when a load was going to be late, but that was not typical. The record shows that Allemani had contact with Confederate Packaging regarding the status of its daily deliveries, but other than that single customer, the record does not show that dispatchers had any ongoing contact with customers or any responsibility for maintaining customer relationships, ensuring customer satisfaction, soliciting customers, or responding to customer complaints.

Pratt's argument that Plaintiffs played a role in ensuring legal compliance is also weak. It is undisputed that Plaintiffs did not assign loads to drivers who had not fulfilled their DOT requirements. It is also undisputed that dispatchers sent drivers to complete random drug testing. However, Pratt's safety director

was responsible for tracking drivers' compliance with DOT regulations and for entering that information into Pratt's computer system. Therefore, although dispatchers were required to consult the computer system to see if a driver was legally available to receive an assignment, they were not ultimately responsible for ensuring drivers' compliance or for tracking or maintaining compliance information.

Furthermore, the record shows that Plaintiffs were not managers of drivers. In fact, Broyles' Powerpoint presentation stated explicitly: dispatchers are not your supervisors; drivers report to the logistics manager. Further, it said, dispatchers have no authority to approve or reject vacation requests, grant or deny FMLA leave, or make scheduling or operational changes. According to Broyles' own deposition testimony, dispatchers have authority to "write up" or give written warnings to drivers, but they have no authority to give final written warnings, suspend or terminate drivers. Broyles and Holley stated that they relied on Plaintiffs to give them information about drivers' performance, but Barlow only completed formal performance evaluations of drivers in 2007 and 2011, and Allemani only performed such evaluations in 2007. Notably, Broyles

23

and Holley could not identify any instance in which Plaintiffs' reviews or recommendations resulted in an employee's promotion or termination.

Pratt argues that dispatchers have an impact on Pratt's bottom line. Essentially, the argument goes, dispatchers help Pratt make money by performing their job well.  According to Broyles, they also provide information to him and other management personnel to assist their understanding of dispatch operations, including costs.  These "budget" activities, however, are common among most employees in most businesses.  When employees perform well, the company does well, and raw data and first-hand information about operating costs has to come from somewhere.  Importantly for this analysis, however, dispatchers do not have any responsibility for planning the budget and they have no control over the budget.

The Court is aware that in some cases, dispatchers have been classified as administrative employees.  For instance, in Puentes v. Siboney Constr. Co., No. 11-80964-CIV, 2012 WL 5193417, at *2-3 (S.D. Fla. Oct. 19, 2012), the court found that a dispatcher worked in an administrative capacity where the dispatcher: took orders directly from customers; visited job sites daily to oversee and supervise truckers; acted as a liaison between the company's

24

owners and job superintendents; assured the work was done correctly and to the satisfaction of the customer; handled any problems or emergencies that arose in the field; and had full authority to refuse any drivers or not hire them again. Clearly, the dispatcher's duties in Puentes went far beyond assigning loads and backhauls to drivers. The dispatcher in that case was the "front man" for his employer on job sites and his regular duties included personnel management and customer service – duties notably absent from Plaintiffs' day-to-day responsibilities.

In Rock v. Ray Anthony Int'l, LLC, 380 Fed. App'x 875, 876 (11th Cir. 2010), the Eleventh Circuit affirmed the district court's finding that a salaried dispatcher for a crane rental company qualified under the FLSA's administrative exemption. In that case, like Puentes, the dispatcher's primary duties included, among other things: sales, customer communication, and overseeing other employees. 380 Fed. App'x at 877-78. To support its decision in Rock, the court cited Hogan v. Allstate Ins. Co., 361 F.3d 621 (11th Cir. 2004), "in which [the circuit] concluded that even when employees engage in sales, their duties are administrative if the majority of their time is spent advising customers, hiring and training staff, determining staff pay, and

25

delegating matters to staff." Id. at 879. Again, these factors are missing from the case now before the Court. There is no evidence that Plaintiffs' *primary* duty involved interacting with customers, hiring and training drivers, or determining drivers' pay.

This case is more similar to Alvarez v. Key Transp. Serv. Corp., 541 F. Supp. 2d 1308 (S.D. Fla. 2008). There, a car dispatcher with a job title of Night Dispatch Manager had the following duties: dispatching drivers to their assigned jobs and ensuring they arrived on time; monitoring traffic, weather and airport delays; interacting with clients, airport representatives and drivers; updating trip logs for record keeping purposes; reporting vehicle breakdowns to upper management; and alleviating driver and customer problems. 541 F. Supp. 2d at 1309-10. The dispatcher in Alvarez also occasionally circulated memos to other employees on topics like complimentary drinks and taking days off. Id. at 1310. Based on these facts, the court found that "Alvarez's duties were not directed toward management or the general business operations of Key" and Key had not carried its burden of showing that Alvarez fell within the administrative exemption. Id. at 1313-14. Arguably, the dispatcher's duties in Alvarez were more administrative in nature than Plaintiffs' duties because in

Alvarez, the dispatcher had regular interaction with clients, handled customer

problems, and circulated memos to other employees.

This case is also analogous to Cotten v. HFS-USA, 620 F. Supp. 2d 1342,

1350 (M.D. Fla. 2009), where the court found that a field supervisor for a home

finishing services company was not an exempt administrative employee.  In

support of its decision, the court noted that even though field supervisors

"managed" certain installation sites, they did *not*: negotiate or execute contracts,

create work orders, or develop applicable installation standards; perform duties

directly related to HFS's financing, budgeting, accounting, auditing, research,

employee benefits, taxes, insurance, advertising, or computer technology; get

involved with formulating business policies or procedures; have ultimate

responsibility for security and safety issues on the job site; interview or hire

subcontractors; handle any significant repairs or issues; or have primary

responsibility for the profitability of the company's projects.  Id. at 1348-50.

Based on the standards and authority discussed above, the Court finds that

Plaintiffs' primary duty was not directly related to the management or general

business operations of Pratt or Pratt's customers.

27

2.     *Exercise of discretion and independent judgment with respect to matters of significance*

Even if Plaintiffs' primary duty could be classified as administrative, Pratt has failed to establish the third element under the administrative exemption – that Plaintiffs exercised discretion with respect to matters of significance. The discretion exercised by Plaintiffs was limited, and it was almost entirely related to assigning loads and backhauls to particular drivers. It is undisputed that dispatchers did not identify the "hot loads," nor did they schedule other loads for customers. Their discretion in assigning loads arose in trying to equalize hours among available drivers and occasionally, determining whether a driver would be able to complete a job fast enough.[3]

This exercise of discretion, along with other decisions like whether to write up a driver for refusing to take a load, are not "matters of significance" as the term is meant under the FLSA. "Generally, 'matters of significance'

---

[3] Pratt emphasizes that several other factors went into assigning loads, such as: status of equipment, availability of loads, whether the driver was sick or delayed at a customer location, and whether the driver had completed all of his DOT requirements. However, these factors speak less about dispatchers' discretion and more about physical, actual *availability* of loads, trucks and drivers to complete assignments. Obviously, a dispatcher cannot assign a load that does not exist. Dispatchers also cannot assign loads to drivers who are not present. This amounts to common sense, not meaningful discretion on the part of dispatchers.

28

include responsibilities dealing with matters of broad scope and significant detail that have a profound effect on the employer's business," such as: "matters that have significant financial impact, negotiating and binding the company on significant matters; and planning long- or short-term business objectives." Alvarez, 541 F. Supp. 2d at 1313-14 (citation omitted).  Whether a particular driver received an assignment over another driver does not rise to this level of significance.

Furthermore, Pratt's argument that Plaintiffs' job performance had a significant impact on Pratt's overall business does not alter the Court's analysis. "An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly."  29 C.F.R. § 541.202(f).  Therefore, the Court concludes that Pratt has failed to show that Plaintiffs fall within the FLSA's administrative exemption.

B.    Executive Exemption

"Employee employed in a bona fide executive capacity" means any employee:

29

(1) Compensated on a salary basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).  The Parties' submissions focus on the second and fourth elements.

### 1.    *Primary duty*

Pratt does not argue that Plaintiffs' primary duty was to manage the entire enterprise, but rather to "manage Conyers dispatch operations."  Plaintiffs maintain that their primary duty – assigning loads and backhauls – was not a management function.  Again, the Court agrees with Plaintiffs.

Under Department of Labor regulations, "management" includes activities such as:

AO 72A
(Rev.8/82)

> interviewing, selecting and training employees;
> setting and adjusting their rates of pay and hours of
> work; directing the work of employees; maintaining
> production or sales records for use in supervision or
> control; appraising employees' productivity and
> efficiency for the purpose of recommending
> promotions or other changes in status; handling
> employee complaints and grievances; disciplining
> employees; planning the work; determining the
> techniques to be used; apportioning the work among
> the employees; determining the type of materials,
> supplies, machinery, equipment or tools to be used or
> merchandise to be bought, stocked and sold;
> controlling the flow and distribution of materials or
> merchandise and supplies; providing for the safety
> and security of the employees or the property;
> planning and controlling the budget; and monitoring
> or implementing legal compliance measures.

29 C.F.R. § 541.102.  In support of its position, Pratt points to the following

"management" duties of Plaintiffs: ensuring loads were delivered in a timely

and safe manner; working independently without direct or on-site supervision;

planning and directing work of many drivers per shift; serving as the first point

of contact when drivers had problems; giving mandatory load assignments to

drivers; conducting informal and formal performance reviews of drivers;

training and disciplining drivers; managing drivers' schedules; resolving

31

drivers' complaints and grievances; coordinating repair work; helping Pratt stay in compliance with DOT regulations; and impacting Pratt's profits and losses.

Plaintiffs respond that they did not perform duties in the vast majority of "management" categories, and certainly were not managers as their primary duty.  For instance, they assert, they did not: hire, interview, select or train drivers; set pay or hours for drivers; direct work of drivers after loads were assigned; have authority to address driver complaints or grievances about Pratt or company policies; discipline drivers; coordinate repairs; plan or control the budget; or track and record drivers' compliance with regulations.  Again, Plaintiffs point to Broyles' Powerpoint presentation, which explicitly stated that dispatchers are not drivers' supervisors and they do not have authority to grant leave, change drivers' schedules, or make operational changes.

The Court has already addressed some of the alleged "management" duties performed by Plaintiffs.[4]  And again, <u>Alvarez</u> is persuasive.  There, the court found that most of the car dispatcher's duties fell outside the description

---

[4] Some of Plaintiffs' alleged "management" duties identified by Pratt are directly refuted by Pratt's own witness.  For example, Broyles stated in his deposition that dispatchers were not authorized to discipline drivers (through final written warnings, suspensions, or termination).  His Powerpoint also stated that dispatchers could not manage or change drivers' schedules or approve leave time.

of "management."  541 F. Supp. 2d at 1315.  For instance, like Plaintiffs, the

dispatcher did not interview or select employees, or set their rate of pay.  He

also did not determine the techniques for dispatching cars.  Id.  Similarly, here,

Plaintiffs assigned the "hot loads," which were identified by someone else, then

the scheduled loads, which were arranged by someone else, and then attempted

to equalize hours between drivers for the remaining assignments, which was in

accordance with company policy.  In other words, the dispatching process itself

was not designed or controlled by Plaintiffs.  And like Alvarez, Plaintiffs did

not plan or control any budgets, nor did they monitor parts of the company for

legal compliance.  Id.  Importantly, the court in Alvarez found the fact that the

dispatcher had authority to handle complaints, discipline employees and fire

employees insufficient to establish a primary duty of "management." Id. at

1316.  Based on the evidence before the Court, Plaintiffs' duties did not even

extend that far.

Here, although Broyles stated that dispatchers have some responsibility

for training drivers, Pratt has not identified any specific training responsibilities

other than those performed by Barlow when he was *not* working as a dispatcher.

To the extent Plaintiffs dealt with driver complaints and grievances and

33

evaluated drivers' performance, the record shows that Plaintiffs lacked any real authority to resolve serious grievances or impact drivers' job status. Instead, dispatchers served more as sounding boards for drivers because the logistics managers were often in another location.

In Diaz v. Team Oney, Inc., 291 Fed. App'x 947, 948 (11th Cir. 2008), the Eleventh Circuit court affirmed the district court's finding that an employee was covered by the FLSA's executive exemption. The Circuit agreed that the company had met its burden of showing that the plaintiff, an assistant manager at two of the defendant's Papa Johns restaurants, was exempt where the plaintiff's managerial duties included: being the highest ranking employee on duty during the majority of his shifts; supervising drivers, counter persons, and cooks; apportioning work among other employees; making deposits; interviewing prospective employees; engaging in marketing for the restaurants; making recommendations to the store manager as to hiring and firing decisions; and generally being "in charge" of the restaurant during his shifts, except for a few hours when the store manager was present. 291 Fed. App'x at 949-50. Unlike Diaz, Plaintiffs do not supervise different types of employees, make deposits, interview prospective employees, or engage in marketing activities.

34

To the extent Plaintiffs were peripherally involved in a few management-type activities, it cannot be said that management was their *primary* duty. According to Allemani, "almost all" of his time as a dispatcher was spent assigning loads and backhauls to drivers. Similarly, Barlow stated that he spent "at least 75%" of his time on those tasks. Assigning loads and backhauls does not constitute "management" activity as defined by the relevant regulations. Therefore, the Court finds that Plaintiffs' primary duty was not management of a recognized subdivision of Pratt.

> 2. *Suggestions regarding hiring, firing and advancement given particular weight*

The Parties agree that Plaintiffs had no authority to hire or fire other employees. Thus, Pratt must show that Plaintiffs' recommendations as to hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight. Again, the Court finds that Pratt has not carried its burden.

To determine whether an employee's recommendations were given "particular weight," courts consider the following factors: (1) whether it is part of the employee's job duties to make such suggestions and recommendations; (2) the frequency with which suggestions and recommendations are made or

35

requested; and (3) the frequency with which the employee's suggestions and recommendations are relied upon.  29 C.F.R. § 541.105.  Although it is not part of dispatchers' formal job description to give recommendations regarding other employees' employment status, Broyles and Holley stated that they relied on Plaintiffs to give them feedback about drivers' performance.  And Plaintiffs admit that they did "write up" drivers, albeit infrequently.  For instance, Allemani wrote up three or four drivers during his tenure.  However, there is no evidence that these "write-ups" usually, often, or ever contain recommendations regarding hiring, firing, or advancement.

It cannot be said that Plaintiffs' suggestions and recommendations regarding personnel decisions were requested frequently or that their suggestions were relied upon by their superiors.  During the course of his employment with Pratt, Barlow completed formal performance evaluations on only two occasions, once in 2007 and once in 2011.  Allemani completed formal evaluations on only one occasion in 2007, and identified only one instance where he recommended that a driver be suspended.  Perhaps most notably, Pratt cannot identify a single instance in which it relied on Plaintiffs' recommendations to make hiring, firing, or advancement decisions.

36

In <u>Pinillia v. Northwings Accessories Corp.</u>, No. 07-21564-CIV, 2007 WL 3378532, at *3 (S.D. Fla. Nov. 13, 2007), the court found that the plaintiff's recommendations as to personnel decisions were given particular weight.  The facts relied on by the court included: plaintiff was the sole person to determine whether applicants were qualified for certain positions; once plaintiff determined that an applicant was qualified, the defendant's human resources department simply did background screening and drug testing; if the plaintiff determined that an applicant was unqualified, the applicant was not hired; in order for personnel forms to be valid regarding hiring, firing and change in employment status, the plaintiff's signature was required; the plaintiff completed performance evaluations when a subordinate requested a salary increase; and where the plaintiff reported to his superiors that subordinates were performing poorly, at least some of those subordinates were fired.  <u>Id.</u>

Pratt's evidence falls far short of that present in <u>Pinillia</u>.  Pratt simply has not shown that Plaintiffs' recommendations in this area were given particular weight, or indeed, that they were given any weight at all.  Therefore, the Court concludes that Pratt has failed to show that Plaintiffs fall under the FLSA's executive exemption.

37

C.      Combination Exemption

For the reasons stated above, the Court finds that the so-called "combination exemption" does not cover Plaintiffs.  Plaintiffs' primary duty – assigning loads – was neither administrative nor executive as those terms are defined in the pertinent regulations.  Further, as discussed in detail above, any administrative or management tasks completed by Plaintiffs were incidental to their main function as dispatchers and even when combined, do not qualify as their "primary duty."  Therefore, Pratt may not rely on this exception to the FLSA's overtime wage requirement.

D.      Damages

The remaining issues raised in Plaintiffs' submissions relate to damages; namely, the proper method for calculating damages in this case and the availability of liquidated damages.[5]  The Court will address each of these issues, in turn.

1. *Calculation of Damages*

In its Response, Pratt asserts that this issue is not ripe because there has

---

[5] Because Pratt did not maintain records of the number of hours worked by Plaintiffs, the amount of damages owed is an open question.

38

been no finding of liability.  However, as a result of the Court's granting of

Plaintiffs' motion for partial summary judgment, the issue of damages is now

properly before the Court.

The FLSA provides for overtime compensation "at a rate not less than

one and one-half times the regular rate at which [an employee] is employed."

29 U.S.C. § 207.  Thus, determining the "regular rate" at which Plaintiffs were

employed is essential.  The "regular rate" under the FLSA is the amount an

employee receives per hour.  29 C.F.R. § 778.109.

For salaried employees like Plaintiffs, "the regular hourly rate of pay, on

which time and a half must be paid, is computed by dividing the salary by the

number of hours which the salary is *intended to compensate*."  29 C.F.R. §

778.113(a) (emphasis added).  If Plaintiffs had been hired to work a fixed

number of hours per week, the intention of the Parties would be ascertainable

by simply dividing Plaintiffs' weekly salary by that fixed number of hours.

Here, however, Plaintiffs' weekly hours fluctuated.

Generally, an employee's regular rate of pay is a factual matter.  Urnikis-

Negro v. Am. Family Prop. Serv.s, 616 F.3d 665, 680 (7th Cir. 2010) (citing

Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424-25

39

(1945)).  Because it is unclear from the record whether Plaintiffs' salary was intended to compensate them for forty hours per week, fifty hours per week, or all hours worked in a week, the Court cannot make a final determination on this issue as a matter of law.[6]  However, the Court can determine the method of calculation to be used depending upon the decision of the fact finder as to the intent of the parties.

Plaintiffs fully briefed this issue in their motion.  Based on its ripeness argument, Pratt did not fully address the issue and sought to reserve its right to provide more detailed briefing.  Plaintiffs urge the Court to conclude that Pratt has abandoned its opportunity to argue this issue on its merits.  Because the Court wishes to have the benefit of a full briefing on the issue, it will decline Plaintiffs's request and allow Pratt to supplement its response on this issue.

Pratt may file a supplemental response solely on this issue within 14 days of the entry of this Order, and Plaintiffs may file a Reply within 7 days

---

[6] Plaintiffs' focus on the Supreme Court's decision in <u>Overnight Motor Transp. Co. V. Missel</u>, 316 U.S. 572 (1942), and whether the "flexible work week" method should be applied to calculate Plaintiffs' damages is premature.  The factual question regarding how many hours Plaintiffs' salary was intended to compensate must be answered first.

thereafter.  The Court will reserve ruling on this issue until the briefing is
complete.

### 2.  Liquidated damages

When employees are misclassified under the FLSA such that they are
denied overtime compensation owed to them, but the employer can show the
classification was made in good faith, courts may, in their discretion, award no
liquidated damages or reduced liquidated damages.  29 U.S.C. § 260.  Based on
the record now before it, the Court cannot determine as a matter of law whether
Pratt acted in good faith when it classified dispatchers as exempt employees.
The evidence shows that Pratt did review employees' classifications when it
implemented the ADP payroll system in 2008 and that as a result of that review,
some positions were re-classified.  The reasonableness of Pratt's reliance on
ADP's advice regarding employees' exempt and non-exempt status is an open
factual issue.  Therefore, Plaintiffs are not entitled to summary judgment on the
issue of liquidated damages.

AO 72A
(Rev.8/82)

**Conclusion**

Based on the foregoing, Plaintiffs' Motion for Partial Summary Judgment [66] is **GRANTED in part and DENIED in part**, and Defendant's Motion for Summary Judgment [67] is **DENIED**.  The following issues remain: the method for calculating Plaintiffs' damages, the amount of Plaintiffs' damages, and award, if any, of liquidated damages.  Pratt may file a supplemental response solely on this issue of calculation of damages within 14 days of the entry of this Order, and Plaintiffs may file a Reply within 7 days thereafter.  The Court will reserve ruling on this issue until the briefing is complete.

SO ORDERED, this 6th day of June, 2014.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)